J. S33011/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| SANTO MANCUSO, | : | No. 1345 EDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, February 22, 2013,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0003330-2012

BEFORE:  FORD ELLIOTT, P.J.E., OLSON AND STABILE, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:  **FILED OCTOBER 21, 2014**

Appellant challenges the judgment of sentence imposed following his conviction for third degree murder and possessing instruments of crime.[1] Finding no error, we affirm.

Appellant's convictions arose from a fight that erupted between members of two families during a New Year's Eve street celebration on Jessup Street in Philadelphia on December 31, 2011.  During the brawl, Jimmy Testa punched appellant twice.  Appellant fell down, but got back up, producing a knife.  Jimmy Testa retreated and appellant stabbed 77-year-old Joseph Testa, who was standing nearby, twice in the chest.  Joseph Testa later died of his wounds.

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 907(a), respectively.

On February 22, 2013, appellant was found guilty of the aforementioned offenses following jury trial. Because he had previously been convicted of third degree murder, appellant was sentenced to life imprisonment with a concurrent term of 2½ to 5 years' imprisonment for possessing instruments of crime. This timely appeal followed.

Appellant raises the following issues on appeal:

> I. Is the appellant entitled to an arrest of judgment with respect to his convictions for murder of the third degree and possessing instruments of crime since the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving the appellant's guilt beyond a reasonable doubt?
>
> II. Is the appellant entitled to a new trial since the verdicts of guilt as to murder of the third degree and possessing instruments of crime are against the weight of the evidence?
>
> III. Is the appellant entitled to a new trial as a result of the prosecutor's cross-examination of defense witness Connie Immendorf as to the fact that she did not give a statement to defense counsel and provided no statement to the Commonwealth?
>
> IV. Is the appellant entitled to a new trial as a result of misconduct committed by the prosecutor in his summation?
>
> V. Is the appellant entitled to a new trial as a result of the trial court instructing the jury as to flight?

Appellant's brief at 5.

We find no error with the trial court's analysis. After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the questions raised on appeal. The trial court's meticulous, 23-page opinion, filed on December 17, 2013, comprehensively discusses and properly disposes of the questions presented. We will adopt it as our own and affirm on that basis.[2]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2014

---

[2] Appellant's second issue questions the weight of the evidence to support his convictions. We note that "appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." **Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013). As to the weight claim, we have reviewed the trial court's analysis of the weight issue and find no abuse of discretion.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :

CP 51 CR 0003330-2012

V.

CP-51-CR-0003330-2012 Comm. v. Mancuso, Santo
Opinion

SANTO MANCUSO

7096613981

**FILED**

DEC 17 2013

Criminal Appeals Unit
First Judicial District of PA

**OPINION**

DeFino-Nastasi, J.

**PROCEDURAL HISTORY**

On February 22, 2013, following a jury trial, the Defendant was found guilty of: third-degree murder,[1] and possession of an instrument of crime (PIC).[2] The Defendant was sentenced to a mandatory life sentence without the possibility of parole for the third-degree murder conviction,[3] and received a concurrent sentence of 2 ½ to 5 years incarceration for the PIC conviction.

On October 2, 2013, the Defendant filed a 1925(b) Statement claiming that: (1) the Commonwealth failed to sustain its burden of proving the Defendant's guilt beyond a reasonable doubt as to murder of the third degree and possession of an instrument of crime; (2) the verdicts of guilt as to murder of the third degree and possession of an instrument of crime are against the weight of the evidence; (3) prosecution inappropriately cross-examined defense witness, Connie Immendorf; (4) prosecution engaged in misconduct during closing arguments; and (5) the court erred when it charged the jury as to flight.

---

[1] 18 Pa.C.S. 2502(c)
[2] 18 Pa.C.S. 907
[3] This was the Defendant's second third-degree murder conviction.

1

## FACTS

On December 31, 2011, Sergeant Jeremy Broscious responded to a Radio call to go to the 2500 block of South Jessup Street in Philadelphia. (Notes of Testimony, Trial, February 20, 2013, pp. 50). Upon arriving at the scene, he noticed a large crowd of people standing outside on the block. (N.T., id., pp. 51). He saw a 77-year-old white male, later identified as Joseph Testa (hereinafter "the decedent"), with a large bloody wound to the middle of his chest area sitting in a chair by the front door of 2540 South Jessup Street. (N.T., id., pp. 52). Sergeant Broscious called the medics for the victim. (N.T., id., pp. 53).

Genevieve Aleiso testified that on December 31, 2011 she was at her sister Patricia Testa's house, along with other members of her family. (N.T., id., pp. 108-09). Shortly after midnight, the other members of her family left the house and walked to the corner of Jessup and Shunk Streets to watch fireworks. (N.T., id., pp. 112). She stayed on her sister's porch. (N.T., id., pp. 111). She could see the decedent, who lived at 2540 South Jessup Street, on his porch when she was outside. (N.T., id., pp. 113).

Ms. Aleiso saw Santo Mancuso (hereinafter "the Defendant") when he came outside of a house at 2554 Jessup Street with his sister, Lisa. (N.T., id., pp. 115). After a short period of time, she saw the Defendant and Lisa go back inside 2554 Jessup Street. (N.T., id., pp. 115). Two minutes later she saw the Defendant return outside with his brother-in-law, Mike and walk to the corner Jessup and Shunk Streets. (N.T., id., pp. 117-19).

Five minutes later, she saw people running back from the corner of Jessup and Shunk Streets towards where she was standing. (N.T., id., pp. 117-119). She observed a confrontation wherein Mike pushed Trisha Leone (her niece) away from Lisa (the Defendant's sister). Her

2

nephew, Jimmy Testa, ran towards the confrontation. (N.T., id., pp. 117-119). The Defendant put his hand behind his back and approached Jimmy Testa. (N.T., id., pp. 120). Jimmy Testa knocked the Defendant down in front of 2542 Jessup Street. The Defendant stood back up with a knife in his hand. (N.T., id., pp. 120). The Defendant lunged at Jimmy Testa with the knife. (N.T., id., pp. 120). When Jimmy Testa moved out of the way, she could see Joseph Testa (hereinafter "the decedent") standing near Jimmy Testa. Id. She saw the Defendant stab the decedent twice. (N.T., id., pp. 119-21). Jimmy Testa was already up the steps of the decedent's house before the Defendant stabbed the decedent. (N.T., id., pp. 127).

Jimmy Testa further testified that he was in his house at 2547 Jessup Street with several members of his family on New Year's Eve. (Notes of Testimony, Trial, February 20, 2013, pp. 9-10). After midnight, he went outside with other members of his family and walked to the corner of Jessup and Shunk Streets to watch fireworks. (N.T., id., pp. 11-13). He saw the Defendant and Mike (the Defendant's brother-in-law) walk to the corner, followed by Lisa, the Defendant's sister. (N.T., id., pp.15-16). As she was walking, he could hear Lisa say something to his sister, Trisha. Id. Trisha crossed over to the west side of the street, and met Lisa behind a car where they started to punch and wrestle with each other. (N.T., id., pp.18-19). He started walking over towards the confrontation between Trisha and Lisa and saw Mike walking towards the confrontation. Id. He saw Mike go after Trisha with his fist curled into a ball. (N.T., id., pp. 20). He punched Mike in the face, which caused Mike, Trisha, and Lisa to fall over. (N.T., id., pp. 21).

Jimmy Testa testified further that after punching Mike he saw the Defendant go after Trisha. (N.T., id., pp. 22). He grabbed the Defendant and punched him twice. (N.T., id., pp. 23-25). He saw the Defendant fall down and then get back up with a knife in his hand. (N.T., id., pp. 25). Upon seeing the knife, he backed away and ran towards the steps of the decedent's house. Id. When he

3

turned around he saw the decedent behind him. The decedent said to him, "I think Santo stabbed me," and showed him the stab wound. (N.T., id., pp. 27). He then called 9-1-1. Id.

Officer Ann Brown was called to 2500 block of Jessup Street on New Year's Eve 2011. She went to 2544 South Jessup Street to arrest the Defendant. She saw drops of blood on the railing leading up to the house. (N.T., id., pp. 62). When she attempted to arrest the Defendant, a struggle ensued and the door was closed in her face. (N.T., id., pp. 63). Eventually, Officer Brown was able to arrest the Defendant, who was in the basement. (N.T., id., pp. 66). In the Defendant's front left pocket, she found a folding knife, which had blood on the handle and was wet with what appeared to be water. (N.T., id., pp. 66).

Dr. Collins, a deputy chief medical examiner at the Philadelphia Medical Examiner's Office, testified as an expert in forensic pathology. (N.T., id., pp. 134). He testified that the decedent had a stab wound in the midline of the upper right side of his chest that penetrated soft tissue and the right chest cavity penetrating his lung, which resulted in the loss of 2 liters of blood; a stab wound on the right side of his chest which penetrated the soft tissues; and superficial cuts on his forearm and contusions on his left hand. (N.T., id., pp. 139-40). Dr. Collins testified that the injuries received by the victim were consistent with being caused by the knife recovered by Officer Brown from the Defendant. (N.T., id., pp. 154). Dr. Collins opined that the cause of death was a stab wound to the chest and the manner of death was homicide. (N.T., id., pp.157).

Dr. Linden Matthew Schwartz, M.D., was called by the defense as an expert witness in the area of physical medicine and rehabilitative medicine. (Notes of Testimony, Trial, February 21, 2013, pp. 32). She testified that the Defendant received an injury to the left upper cheek area, to the lip, and to the right lateral thigh and a laceration in the right leg and lateral leg. (N.T., id., pp. 42),

4

Dr. Shwartz testified that the injuries were the direct result of the Defendant being punched. (N.T., id., pp. 47). Dr. Schwartz also testified that the injury sustained by Connie Immendorf (the Defendant's mother, a bruised right hip, was consistent with her being assaulted. (N.T., id., pp. 52).

Connie Immendorf testified that on New Year's Eve 2011 she was at her daughter's house at 2544 Jessup. (N.T., id., pp. 66). Lisa, Mike, their son Nino, and the Defendant were also at the house. Id. After midnight, the Defendant went to the corner of Jessup and Shunk Streets, followed by Lisa and Mike. (N.T., id., pp. 68). In front of 2548 Jessup Street, Trisha Leone crossed the street and clawed at Lisa. Id. Mike tried to break up the fight. Id. Jimmy Testa attempted to punch Mike. (N.T., id., pp. 69). Jimmy Testa punched the Defendant. (N.T., id, pp. 70). The Defendant fell to the ground. Id. She saw the decedent walk towards where the Defendant and Jimmy Testa were fighting and kick the Defendant in the head. Id. Jimmy Testa then threw her to the ground. The Defendant tried to help her get back into her daughter's house but Jimmy Testa and the decedent were blocking her path. (N.T., id., pp. 70). Jimmy said to her, "You motherfucker, I'm going to kill you." Id. She saw the Defendant take out a knife but did not see what he did with it. (N.T., id., pp. 72). Her nose and fingers were bleeding when she went in the house. (N.T., id., pp. 72).

## ANALYSES

In his first issue, the Defendant claims that he is entitled to an arrest of judgment with respect to his convictions for murder in the third degree and possession of an instrument of crime since the Commonwealth failed to rebut his claim of self-defense or defense of others. Specifically, the Defendant argues that there was insufficient evidence to prove he acted with malice because his use of force was in self-defense, imperfect self-defense, or heat of passion.

Whether there was sufficient evidence to support a jury's findings to this effect, the court is to consider whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. Com. v. Cousar, 593 Pa. 204, 217, 928 A.2d 1025, 1029 (2007). In applying this standard, the court may not reweigh the evidence and substitute its judgment for that of the fact-finder. Id. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. The trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. Id.

A criminal homicide constitutes murder of the third degree "when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." Com. v. Morris, 2008 PA Super 235, 958 A.2d 569, 576 (Pa. Super. Ct. 2008). "Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." Id. The elements of the third-degree murder, as developed by case law, are a killing done with legal malice but without the specific intent to kill required in first-degree murder. Com. v. Seibert, 424 Pa. Super. 242, 248, 622 A.2d 361, 364 (1993). Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. Com. v. Gooding, 818 A.2d 546, 550 (Pa.Super.2003).

Section 505 of the Crimes Code sets forth the elements of self-defense:

> § 505. Use of force in self-protection: (a) Use of force justifiable for protection of the person. -- The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> . . .

(b) Limitations on justifying necessity for use of force. --

...

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury,... nor is it justifiable if: (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating...

18 Pa.C.S.A. § 505(a)-(b). When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. Com. v. Bullock, 948 A.2d 818, 824 (Pa.Super.2008). The Commonwealth sustains this burden if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible with complete safety. Com. v. McClendon, 874 A.2d 1223, 1230 (Pa.Super.2005). The Commonwealth need only prove one of these elements beyond a reasonable doubt to sufficiently disprove a self-defense claim. Com. v. Burns, 765 A.2d 1144, 1149 (Pa.Super.2000).

Voluntary manslaughter, pursuant to § 2503, is defined as:

(a) General Rule -- A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) the individual killed; or (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

(b) Unreasonable belief killing justifiable.—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

7

18 Pa.C.S.A. § 2503(a)-(b).

The elements necessary to establish unreasonable belief voluntary manslaughter require proof of "an unreasonable belief rather than a reasonable belief that deadly force was required to save" the defendant's life. Com. v. Ventura, 2009 PA Super 96, 975 A.2d 1128, 1143 (Pa. Super. Ct. 2009). The other elements of justification under 18 Pa.C.S. § 505 "must still be met in order to establish unreasonable belief voluntary manslaughter." Id.

A person is guilty of "heat of passion" voluntary manslaughter "if at the time of the killing he reacted under a sudden and intense passion resulting from serious provocation by the victim." Com. v. Ragan, 560 Pa. 106, 743 A.2d 390, 396 (1999). "Heat of passion includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason." Com. v. Mason, 559 Pa. 500, 741 A.2d 708, 713 (1999). An objective standard is applied to determine whether the provocation was sufficient to support the defense of "heat of passion" voluntary manslaughter. Com. v. Laich, 566 Pa. 19, 777 A.2d 1057, 1066 (2001). "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, [would become] impassioned to the extent that his mind was incapable of cool reflection." Com. v. Thornton, 494 Pa. 260, 431 A.2d 248, 252 (1981).

With regard to the Defendant's self-defense, defense of others, and unreasonable belief voluntary manslaughter claims, the evidence presented at trial supports the proposition that the Defendant did not reasonably believe that either he or Ms. Immendorf was in danger of death or serious bodily injury. Witnesses testified that the dispute centered on a quarrel between Trisha Leone and Lisa, which caused Lisa's husband, Mark, to become involved, as well as Trisha's brother, Jimmy Testa. There was no evidence to suggest that Lisa, Trisha, Jimmy Testa, the

8

decedent, or Mark were armed during the confrontation. The Defendant was the first individual to produce a weapon and pursue the confrontation.

The evidence established that the Defendant came to the confrontation armed with a knife, was punched twice by Jimmy Testa, and fell to the ground. The jury could have found that the Defendant did not reasonably believe that he was in danger of death or serious bodily injury from the two punches by Jimmy Testa. Moreover, if the jury believed Ms. Immendorf that she was pushed to the ground, the jury could have found that the minor injuries sustained by her were not of the sort to which created a belief that she was in danger of death or serious bodily injury.

There was also evidence that Jimmy Testa immediately retreated once he saw the Defendant get back up with a knife in his hand. This supports the proposition that any further use of the knife constituted provocation or continuance of the use of force, which would defeat any claim of unreasonable belief self-defense. The jury could have also found that Jimmy Testa's retreat gave the Defendant an opportunity to retreat, of which he did not avail himself. As such, the evidence at trial was sufficient to disprove the Defendant's self-defense, defense of others, and unreasonable belief voluntary manslaughter claims.

With regard to the Defendant's claim of heat of passion voluntary manslaughter, the jury could have found that a fist fight between Mark, Trisha, Lisa, and Jimmy Testa was not sufficient provocation to support a heat of passion charge, nor was the fact that the Defendant was punched twice in the head. Moreover, the jury was free to believe or disbelieve Ms. Immendorf's testimony that she was knocked to the ground, her path blocked, and Joseph Testa was yelling that he was going to kill her. Even if the jury believed Ms. Immendorf, they may have found that such actions were not sufficient provocation such that a reasonable person would be incapable of cool reflection

9

since there was no evidence that Joseph Testa or Jimmy Testa was armed. As such, the evidence at trial was sufficient for the Commonwealth to disprove the Defendant's heat of passion voluntary manslaughter defense.

The Commonwealth provided sufficient evidence to prove each element of third-degree murder beyond a reasonable doubt. Third-degree murder requires a showing of malice which can be inferred from the use of a deadly weapon on a vital part of the victim's body. At trial, evidence showed that the victim died from a penetrating stab wound to the chest, the Defendant was in possession of a knife, and the wounds suffered by the victim were consistent with being caused by the Defendant's knife. The jury heard eyewitness testimony that the Defendant stabbed the victim twice. As such, there was sufficient evidence to support the Defendant's third-degree murder conviction.

Section 907 of the Crimes Code defines the crime of possessing instruments of crime in relevant part as follows:

> (a) Criminal instruments generally.—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.
>
> ...
>
> (d) Definitions.—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
>
> ...
>
> "Weapon."—Anything readily capable of lethal use and possessed under circumstances not manifestly appropriate for lawful uses which it may have. The term includes a firearm which is not loaded or lacks a clip or other component to render it immediately operable, and components which can readily be assembled into a weapon.

18 Pa.C.S.A. 907.

The Commonwealth presented sufficient evidence to prove the Defendant was unlawfully in possession of an instrument of crime. The Defendant ran to the confrontation with a pocket knife

and stabbed the victim twice in the chest after being struck and falling to the ground. Therefore, the evidence was sufficient to support the Defendant's conviction for possession of an instrument of crime.

In his second issue, the Defendant contends that his third-degree murder conviction and possession of an instrument of crime conviction were against the weight of the evidence. Specifically, the Defendant contends that the testimony presented at trial did not rebut the Defendant's claim of self-defense or defense of others. The Defendant contends that at the time the Defendant stabbed the victim, the Defendant was being beaten or had just been beaten by the decedent or Jimmy Testa; he reasonably believed that he was in danger of death or great bodily injury; he acted reasonably under the circumstances; was not the initial aggressor; and did not have a safe avenue of retreat. Moreover even if Joseph Testa was an innocent bystander, the Defendant did not forfeit his claim of self-defense or defense of others. The Defendant claims that the testimony presented at trial did not prove that he acted with malice, and that the testimony presented at trial did not rebut the Defendant's claim of voluntary manslaughter since the Defendant acted in mistaken self-defense or defense of others or in heat of passion.

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Commonwealth v. Johnson, 542 Pa. 384, 394, 668 A.2d 97, 101 (1995), cert. denied, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). Such a claim requires a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice. Com. v. Perez, 3304-08, 2009 WL 6561339 (Pa. Com. Pl. Nov. 18, 2009) aff'd, 4 A.3d 687 (Pa. Super. Ct. 2010). An appellate court cannot substitute its judgment for that of the finder of fact. Id. When the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against

11

the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. Discretion is abused when the course pursued represents not merely an error of judgment, but "where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is the result of partiality, prejudice, bias, or ill will." Com. v. Forbes, 867 A.2d 1268, 1273 (Pa. Super. 2005).

The Defendant's weight of the evidence claim fails since the verdict is not so contrary to the evidence so as to shock one's sense of justice. The evidence at trial established that a quarrel began between Trisha and Lisa, which caused Mark, Lisa's husband, and Jimmy Testa, Trisha's brother, to become involved. The Defendant ran towards the confrontation and was punched by Jimmy Testa. The Defendant pulled out a knife, causing Jimmy Testa to turn away. Then the Defendant stabbed the decedent, a 77-year-old man, who was unarmed and standing behind Jimmy Testa. As discussed above, the evidence supports the jury's verdict. The Defendant's weight of the evidence claim fails.

In the Defendant's third claim he contends that he is entitled to a new trial as a result of the prosecutor's cross-examination of defense witness, Ms. Immendorf, as to the fact that she did not give a statement to defense counsel and provided no statement to the Commonwealth. The Defendant also claims that it was error for the prosecutor to exploit the absence of a statement in his summation to the jury.

On cross-examination of an adverse witness, every circumstance relating to that which the witness has testified or which is within his knowledge may be developed, including any matter germane to direct examination, qualifying or destroying it, or tending to develop facts which have been improperly suppressed or ignored by the adverse party. Com. v. Mickens, 201 Pa. Super. 48,

55, 191 A.2d 719, 723 (1963). Additionally, on cross-examination, a witness may be impeached to show his bias, dishonesty, or defects in his ability to observe, remember or recount the matter about which he has testified. In Interest of M.M., 439 Pa. Super. 307, 330, 653 A.2d 1271, 1282 (1995) aff'd, 547 Pa. 237, 690 A.2d 175 (1997). The scope and manner of cross-examination is within the sound discretion of the trial judge whose decision will not be overturned absent an abuse of discretion. Com. v. Wood, 432 Pa. Super. 183, 210, 637 A.2d 1335, 1348 (1994). In determining the scope of cross-examination the trial court may consider "whether the matter is collateral, whether the cross-examination would be likely to confuse or mislead the jury, and whether it would waste time." Com. v. Brinton, 275 Pa. Super. 304, 309, 418 A.2d 734, 736 (1980).

In this matter, the issue the Defendant complains of on appeal arose when the prosecution asked Ms. Immendorf whether she gave a statement to defense counsel regarding the incident with her son. The cross-examination proceeded as follows:

> Mr. Davis: Did this defense attorney write down a statement that you gave him as to what happened out there when Joseph Testa was killed?
>
> Ms. Immendorf: Yes
>
> Mr. Davis: He Did? Your Honor, at this point I would object. I asked for it and have never received a statement from Ms. Immendorf from defense counsel.

(N.T., Feb. 21, 2013, pp.88). At this point the judge held a sidebar conference to clarify that the witness did not understand the difference between making an official statement, which would be discoverable, and the lawyer's notes during an interview, which are not discoverable. The trial court asked the prosecution to clear up the misunderstanding and move-on since the issue was not central to the proceeding. The prosecution continued the cross-examination as follows:

13

Mr. Davis: Ms. Immendorf, you would agree with me you never gave a full statement that you reviewed and signed.

Ms. Immendorf: Didn't sign nothing at that point.

This cross-examination was proper to test the recollection and reliability of the witness's testimony.

The Defendant further claims that the prosecutor exploited the absence of a statement in his summation to the jury. In closing arguments the prosecutor argued:

> I'm not trying to be disrespectful or rude or mean to an 80-year-old woman, right, when she took the stand and testified earlier today. I'm not trying to do that. But, really, 14 months later you remember every detail like this and you never even wrote it down before, you never went through it like that before. Okay. Even if that is true, why didn't it get written down? Even if you think that the police could have written it down, she talked to the defense attorney in January of 2012. Why not write it down? Wouldn't you want to have something there so you could go back and refresh your memory later on as to what happened? That is pretty important right?

(N.T., Feb. 21, 2013, pp. 161-62).

In closing, the prosecution made no argument about the failure of defense counsel to provide discovery but rather about Ms. Immendorf's ability to recollect, and the potential bias she may have had when testifying. An argument by the prosecution concerning witness recollection and bias is not improper. Accordingly, the Defendant's third claim fails.

In his fourth issue the Defendant argues he is entitled to a new trial as a result of prosecutorial misconduct during closing argument. The Defendant cites the seven following instances of misconduct during the prosecution's closing argument: (1) the prosecution's reference to absence of a statement from a defense witness and defense counsel's nitpicking through

14

Commonwealth witness' statement; (2) reference to the Defendant's claim of self-defense or defense of others as fabrication; (3) reference to the fact that even if defense witnesses were believed, a claim of self-defense or defense of others was not established; (4) reference to other killings; (5) reference to a 9-1-1 call and playing of the tape; (6) comment on the Defendant's silence when the prosecution made reference to the fact that the Defendant did not tell the police at the time of his arrest that he acted in self-defense or defense of others; (7) and posing questions to the Defendant.

The rules regarding prosecutorial misconduct in closing arguments are well settled. In reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made. Generally, comments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Com. v. Sampson, 2006 PA Super 119, 900 A.2d 887, 890 (Pa. Super. Ct. 2006). The conduct of the prosecutor at closing argument is circumscribed by the concern for the right of a defendant to a fair and impartial trial. Id.

The Defendant first claims that the prosecution's reference to absence of a statement from Ms. Immendorf and defense counsel's nitpicking through Commonwealth witness' statement was prosecutorial misconduct. The Defendant's claim regarding the prosecutions reference to absence of a statement is the same claim he made in the third issue and was addressed there. With regard to the statement about "nitpicking," the prosecution stated: "[e]very time I call a witness they all gave statements. And what the defense attorney gets to do every time is nitpick through every sentence."

15

This statement was not one where the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant.

Next, the Defendant claims that it was prosecutorial misconduct to reference the Defendant's claim of self-defense or defense of others as fabrication. As a general rule, it is improper for a prosecutor to express a personal belief or opinion as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness. See Com. v. Kuebler, 484 Pa. 358, 399 A.2d 116 (1979) (where defendant's version of events was branded a "big lie"). In the instant case at closing the prosecutor stated:

> Mr. Davis: So now if you're stuck, you're caught at the scene, you're identified on the scene and you have the murder weapon in your pocket, what option do you have left –

At which point the defense counsel imposed an objection, which the trial court sustained.

While the prosecutor's comments may have been improper, this Court finds that the Defendant was not prejudiced by the Commonwealth's argument. The trial court instructed the jury before closing arguments that an attorney's comments never constitute evidence and are not to be used as evidence. (N.T., Feb. 21, 2013, pp.120). Our Supreme Court has held that a prosecutor's comments during closing are not evidence. Com. v. Baez, 720 A.2d 711 (Pa. 1998). The law presumes that juries follow the proper instructions of the court. Com. v. Jones, 668 A.2d 491 (Pa. 1995). Although this was not a proper line of argument by the Commonwealth, the argument was not so prejudicial as to affect the minds of the jurors so that they would be unable to render a proper verdict.

16

The Defendant next claims it was prosecutorial misconduct for the prosecutor to reference the fact that even if the defense witness were believed, a claim of self-defense or defense of others was not established. Specifically, the Defendant objects to the following argument:

> Mr. Davis: If you believe the entire defense case, and I don't mean the words of the defense attorney, I mean the witness, if you believe her, you still don't have self-defense. As a matter of law--

At this point defense counsel interposed an objection which was overruled by the trial court. The prosecution then proceeded to argue based on the testimony of Ms. Immendorf why self-defense was not established.

It is the role of the trial court to instruct the jury as to the law which applies to the case being tried. Com. v. McKetta, 469 Pa. 223, 227, 364 A.2d 1350, 1352 (1976). Thus, it is not proper for a lawyer to argue to the jury that one rule of law rather than another should apply, to misstate the law or to state it in a manner calculated to confuse the jury. It does not follow, however, that counsel must refrain from any discussion whatever of applicable law. Com. v. Glenn, 321 Pa. 241, 183 A. 763 (1936).

It was not misconduct for the prosecution to argue why the testimony of Ms. Immendorf did not make out self-defense. The prosecution was not arguing that the jury should not apply self-defense to the case, but rather that when Ms. Immendorf's testimony is applied to the law there is not enough evidence to support the claim. Moreover, the trial court instructed the jury before closing arguments that the judge provides the law for which the jury must apply, and that statements made during closing arguments that conflict with the court's instructions should be disregarded. (N.T., Feb. 21, 2013, pp.120).

17

Next, the Defendant claims that the reference to other killings was improper. In closing the prosecution stated:

> Mr. Davis: It might seem unimaginable that somebody would have an intent to kill a 77-year-old-man. It may. But you know what, murders happen every day in this city. We're here for just one of them. And that's all I'm trying to talk about. The reason that I say that murders happen every day because whether we want to face it or not, the very stark reality is this particular killer walks amongst us—
>
> Mr. Pagano: Objection
>
> The Court: Sustained
>
> Mr. Davis: All I'm trying to ask you do is focus on this case, but what I want to try to bring to light here is that you can't look at the man and know what his intent was.

(N.T., Feb. 21, 2013, pp.178).

This Court finds that the reference to other killings was not misconduct as the prosecution was reminding the jury to focus on this one murder despite the other murders that the jury may hear about in their lives. Moreover, even if the statements were improper, they did not have the unavoidable effect of prejudicing the jury, forming in their minds a fixed bias and hostility toward the defendant. See Com. v. Thompson, 538 Pa. 297, 648 A.2d 315, 323 (1994) (holding prosecutor's remark that, "what we are really talking about is beyond those walls, beyond those windows, spilling out into the streets of North Philadelphia, where ordinary people walk, live, breathe and die, every day, breathe and die," was not improper); Com. v. Hamilton, 460 Pa. 686, 334 A.2d 588, 593 (1975) (holding that although the comments were inappropriate, the jury could still render a fair verdict where the prosecutor commented that, "it's difficult at best to live in a community of Philadelphia where crime has been so rampant that people are afraid to walk the

18

streets. Women are afraid to go out after dark. Men are afraid to walk their dogs or go to the corner to put a letter in the mail box. Something must be done about this sort of thing.").

Next, the Defendant claims that the reference to the 9-1-1 call and playing of the tape was improper. During closing argument, the trial court, over defense counsel's objection, permitted the prosecutor to replay selected portions of Ms. Aleiso's 9-1-1 call to establish that the Defendant had a knife and was going to stab someone.

Courts have consistently held that items introduced as evidence can be used during closing argument. See Com. v. Stark, 363 Pa. Super. 356, 373, 526 A.2d 383, 392 (1987) (allowing a recorded confession to be playing during closing argument); Com. v. Wise, 298 Pa.Super. 485, 444 A.2d 1287 (1982) (holding that since the photographs had been introduced as evidence, the prosecutor's use of them for illustration purposes during closing argument did not constitute the creation of new evidence and was not improper); Com. v. Burton, 459 Pa. 550, 330 A.2d 833 (1975) (new trial not warranted where during closing argument prosecutor handled weapons which had been introduced as Commonwealth exhibits).

Next, the Defendant claims that the prosecution's reference to that fact that the Defendant did not tell the police at the time of the arrest that he acted in self-defense or defense of others was improper. The general rule is that it is impermissible for the prosecution to use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged. Com. v. Molina, 2011 PA Super 237, 33 A.3d 51, 62 (Pa. Super. Ct. 2011) appeal granted in part, 616 Pa. 547, 51 A.3d 181 (2012). However, an exception exists when a defendant opens the door to the Commonwealth using his pre-arrest silence under the "fair-response doctrine" even when the appellant does not testify. Com. v. Fischere, 2013 PA Super 191, 70 A.3d 1270, 1278 (Pa.

19

Super. Ct. 2013); see also Com. v. Adams, 39 A.3d 310 (Pa.Super.2012), appeal granted, 616 Pa. 437, 48 A.3d 1230 (2012) (finding prosecutor's closing remarks about defendant's pre-arrest silence did not violate defendant's right to silence).

In the instant matter, the Defendant specifically objects to the following argument during the Commonwealth's closing:

> Mr. Davis: What does he actually do? He goes inside his family's house. Okay. He's in there now. Police Officer Ann Brown, she comes. She knocks. Does he come out with this and say--
>
> Mr. Pagano: Objection
>
> Mr. Davis: before he is arrested
>
> The Court: Overruled
>
> Mr. Davis: -- before, Oh, my god, there was a fight. They were coming at me. I don't know how badly he is hurt, but I stabbed the man. No. No. No. Not even close. Because it takes him three minutes to even answer the door. When they answer the door, really, are you blaming it on your sister now when you say his sister pulls him back in? Guess what? He didn't say, why you pulling me in here? Come in here police, thanks for coming. No. he absolutely goes in there. They slam the door in the police officer's face. He is not coming back out.

(N.T., Feb. 21, 2013, pp. 184). However, during the Defendant's closing argument, defense counsel remarked upon this situation as follows:

> Mr. Pagano: [Officer Brown] says that she knocks on the door. She waits for a few minutes. She said that a young female comes to the door. She also says that she hears the occupants say that the police are there. So someone inside knew that the police were there. Yet Santo goes to the door. She says she saw him. And she said that when she saw him, she reached in to grab him and the young female, Lisa, pulls him away and slams the door.
>
> Well, she knocks again and, finally, Connie opens the door a few minutes later. And where is Santo? He is in the basement. He is wiping blood off of himself. And what does he have? He has the knife.

20

Ladies and gentlemen, if the Commonwealth, they're going to argue that, first of all, he was trying to avoid being arrested. He wasn't trying to avoid being arrested. Lisa is the one that pulled him back in the house.

The Defendant's counsel made the tactical decision to comment on the Defendant's attempt to avoid being arrested. In doing so, the Defendant "opened the door" to the Commonwealth making responsive closing remarks about the circumstances surrounding the Defendant's arrest. It is clear that the portion of the closing to which the Defendant objects is in response to the defense counsel's argument that the Defendant complied with the officers and was not attempting to avoid being arrested. Even if the statements were improper, they did not have the unavoidable effect of prejudicing the jury, forming in their minds a fixed bias and hostility toward the defendant.

In his final argument, the Defendant contends that the posing of questions to the Defendant was improper. During the prosecution's closing the prosecution stated, "[w]hy are you washing off the knife—." To which the defense counsel interposed an objection, which was sustained by the trial court. The court ruled that the question was rhetorical but advised the prosecutor to avoid asking any further questions. This form of argument was not prejudicial as to affect the minds of the jurors so that they would be unable to render a proper verdict. Therefore, the Defendant's claims of prosecutorial misconduct fail.

The Defendant in his final argument claims that he is entitled to a new trial as a result of the trial court instructing the jury as to flight as there was no testimony presented at trial to indicate that the defendant fled from the scene or took any action to conceal any crime he allegedly committed.

The trial court gave a flight instruction, as follows:

There was evidence, including the testimony of Police Officer Ann Brown, that tended to show that the defendant fled from the police or hid

21

from the police. The credibility, weight and effect of this evidence is for you to decide. Generally speaking, when a crime has been committed and a person thinks he may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon the motives that may have prompted the flight or concealment. You may not find the defendant guilty solely on the basis of the evidence of flight or concealment.

(Notes of Testimony, Trial, February 22, 2013, pp. 39-40).

Instructions will be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury properly in its deliberations. Com. v. Rainey, 593 Pa. 67, 113, 928 A.2d 215, 243 (2007). Jury instructions must be supported by the evidence of record; otherwise instructions regarding matters that are not before the court serve no purpose but to confuse the jury. Com. v. Bruce, 717 A.2d 1033, 1037 (Pa. Super. Ct. 1998).

Generally, the trial court can use a flight jury charge when a person commits a crime, knows that he is a suspect, and conceals himself, because such conduct is evidence of consciousness of guilt, which may form the basis, along with other proof, from which guilt may be inferred. Bruce, 717 A.2d at 1037-38.

The record reflects that when Police Officer Ann Brown went to the Defendant's house and said she was going to place him under arrest, the Defendant or members of the Defendant's family struggled with her. There was also evidence presented that when Police Officer Brown was able to enter the house to arrest the Defendant, the Defendant was hiding in the basement. This was sufficient evidence to provide a flight instruction. The trial court did not abuse its discretion in giving the flight charge to the jury. Therefore, this claim is without merit.

22

## CONCLUSION

Based on the foregoing, the judgment of sentence as to the Defendant's convictions for:

Third-Degree Murder and Possession of an Instrument of Crime should be affirmed.

By the Court:

_____
Rose Marie DeFino-Nastasi, J.